## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| BLAINE FLINDERS, et al.,<br><br>          **Plaintiffs,**<br><br>**vs.**<br><br>**WORKFORCE STABILIZATION PLAN OF PHILLIPS PETROLEUM COMPANY,**<br><br>          **Defendant.** | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:04CV541DAK |

This is a class action case brought against Defendant under ERISA as a result of a layoff in connection with the Conoco Phillips merger and Defendant's denial of benefits to Plaintiffs. The parties filed cross motions for summary judgment. The court held a hearing on these motions on February 7, 2006. At the hearing, Plaintiffs were represented by Scott Hagen, and Defendant was represented by Matthew Durham. The court took the motions under advisement. The court has carefully considered all pleadings and memoranda submitted by the parties, the administrative record, and the law and facts relevant to the parties' motions. Now being fully advised, the court enters the following Memorandum Decision and Order.

## BACKGROUND

Plaintiffs brought this action after the Defendant Workforce Stabilization Plan of Phillips Petroleum Company's (the "Plan") denied Plaintiffs' claims for benefits under the Plan

in connection with a layoff that occurred as a result of the Conoco Phillips merger.  The Plan is an employee benefit plan administered on behalf of Phillips Petroleum Company.  The purpose of the Plan is to provide benefits to eligible employees who are laid off in connection with a change in control, such as occurred as a result of the merger of Phillips and Conoco.  The Plan is administered pursuant to a written plan document ("Plan Document") and summary plan description ("SPD"), the terms of which specifically exclude from the Plan employees who are members of a recognized or certified collective bargaining unit unless the Plan is included in the collective bargaining agreement.

On March 4, 2002, Phillips Petroleum Company merged with Conoco resulting in the formation of a new company, ConocoPhillips.  As a result of this merger, the Federal Trade Commission required that ConocoPhillips sell its refinery located in Woods Cross, Utah.  In compliance with this directive, the Woods Cross refinery was sold to Holly Corporation.

Plaintiffs Blaine Flinders and David Brown were employees of the Woods Cross refinery prior to Phillips Petroleum Company's merger with Conoco.  Plaintiffs allege that as a result of the merger, their employment with Phillips Petroleum Company came to an end, constituting a layoff within the meaning of the Plan.

Plaintiffs therefore applied for benefits under the Plan on  June 5, 2003.  The Plan rejected the Plaintiffs' claims for benefits in a letter, dated September 24, 2003, on the grounds that Plaintiffs were members of Local 8-578, Paper, Allied-Industrial, Chemical and Energy Workers International Union ("Local 8-578"), a recognized or certified collective bargaining unit, and that the applicable collective bargaining agreement did not include coverage under the Plan.

2

Article IV of the Plan states that benefits "are available to an Employee who (a) has become a Participant in this Plan." In the Plan's definition of Employee, it states that "[a] member of a recognized or certified collective bargaining unit shall not be an 'Employee' unless coverage under the Plan is included under the collective bargaining agreement." The Plan's definition of a Participant also provides that "[a] member of a recognized or certified collective bargaining unit shall not be eligible to participate in the Plan, without regard to whether such collective bargaining agreement specifically provides for the exclusion of members of such units from participation in the Plan, unless coverage under the Plan is included under the collective bargaining agreement." Article VII of Local 8-578's collective bargaining agreement provides that "[e]xcept, as hereinafter limited, all benefits arranged by the Company for its employees generally, shall be available to employees covered by this Agreement." 2002-2006 Agreement Between Phillips Petroleum Company and Local 8-578, Art. VII, § 1 ("Local 8-578's Agreement").

Plaintiffs appealed the denial of their claim for benefits under the Plan on October 29, 2003, arguing that a reasonable review of the language set forth in Article VII, Section 1 of Local 8-578's Agreement makes clear that coverage under the Plan is included. On December 18, 2003, the Plan responded to this appeal by upholding its previous decision and again denying Plaintiffs' claim for benefits. Having properly exhausted their administrative remedies, the Plaintiffs then filed the above-entitled action on June 14, 2004 as a class-action on behalf of:

> All members of Local No. 8-578, Paper, Allied-Industrial, Chemical & Energy Workers International Union who applied for benefits from the Workforce Stabilization Plan of Phillips Petroleum Company in connection with the sale of the Phillips Petroleum Company Woods Cross Refinery to Holly Corporation on or about June 1, 2003 (the "Woods Cross Claimants").

Plaintiffs' Complaint sets forth a cause of action against the Plan pursuant to ERISA § 502 and claims that the members of the class are eligible and entitled to benefits under the Plan.  The parties stipulated to the certification of the class and the court entered an order granting class certification to the Woods Cross Claimants on November 1, 2004.

The court allowed Plaintiffs to file an Amended Complaint adding additional Plaintiffs, who worked at a Phillips facility in Spokane Washington.[1]  As a result of the Phillips/Conoco merger, Tosco Refining Company (a subsidiary of Phillips Petroleum Company) sold its Spokane, Washington terminal to Holly Corporation.  Steve Kober, Dennis Hawks, Steven Reiber and Scott Reiber, all of whom were members of the Oil, Chemical and Atomic Workers International Union, AFL-CIO, Local Union No. 1-562 ("Local 1-562"), were laid off by Tosco in connection with the sale of the terminal to the Holly Corporation.  After being laid off, these four individuals (the "Spokane Claimants") applied for benefits under the Plan.

Like the Woods Cross Plaintiffs, the Spokane Claimants' application for benefits was denied by the Plan on the basis that they were members of a recognized or certified collective bargaining unit whose collective bargaining agreement did not include the Plan.  The Plan's denial of benefits, which was set forth in a letter dated September 14, 2004, additionally stated that pursuant to the Plan, an appeal of the denial must be filed with the Plan Committee within sixty days after issuance of the denial letter.

---

[1]     The court also granted Plaintiffs leave to file a Second Amended Complaint to add a new cause of action for breach of fiduciary duty against Joseph C. High, the Plan's administrator.  Plaintiffs allege that Mr. High intentionally delayed distribution of the March 12, 2002 SPD, which had been changed to reflect the ineligibility of employees who were members of a union, until after collective bargaining negotiations were completed so as to prevent discussion of workforce stabilization benefits during those negotiations.  This cause of action is not at issue in the present motions for summary judgment.

The Spokane Claimants, by letter dated November 3, 2004, appealed the Plan's denial of benefits on the basis that Article X of Local 1-562's Agreement makes clear that coverage under the Plan was included.  Article X of Local 1-562's collective bargaining agreement provides that "[e]xcept, as hereinafter limited, all benefits arranged by the Company for its employees as a whole, shall be available to all employees covered by this Agreement." February 1, 1999 Working Agreement Between Tosco Refining Company and Local 1-562, Art. X ("Local 1-562's Agreement").  This November 3, 2004 letter, however, may not have been sent to the Plan Committee within the allowed sixty days.  The Spokane Claimants' counsel, in a January 12, 2005 letter to the Plan's counsel, recognized that because of an oversight, the November 3, 2004 appeal may not have been sent to the Plan Committee.  The January 12, 2005 letter therefore included a copy of the November 3, 2004 appeal.  On February 9, 2005, the Plan Administrator sent a letter to the Spokane Claimants' counsel denying the appeal on the basis that it was untimely.  The Plan claimed it did not receive the November 3, 2004 appeal until it received the January 12, 2005 letter, long after the time for filing an appeal had passed.

## DISCUSSION

### Cross Motions for Summary Judgment

Both parties have moved for summary judgment asserting that they are entitled to judgment as a matter of law.  No material facts are in dispute.  The parties dispute the appropriate standard of review and whether the Plan's determinations should be upheld under the appropriate standard.  The parties agree that the Plan language is discretionary, but they dispute the extent of the conflict of interest that exists in this case and the impact of that conflict on the standard of review.

5

**I.  Standard of Review**

ERISA itself does not specify a particular standard of review.  The United States

Supreme Court, however, has held that a denial of benefits challenged under ERISA, "is to be

reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan grants

discretionary authority to the administrator, the denial of benefits is reviewed under the

"arbitrary and capricious" standard.  *Chambers v. Family Health Corp.*, 100 F.3d 818, 825 (10th

Cir. 1996).

The parties in this case agree that the Plan grants discretionary authority to the Plan

Committee.  The parties, however, dispute the appropriate standard of review to apply in this

case because of an alleged conflict of interest.  Defendant asserts that the conflict of interest is a

"standard" conflict that does not alter the arbitrary and capricious standard of review.  Plaintiffs

claim that the decision makers had a serious conflict of interest and such conflict caused

significant procedural irregularities.  Plaintiffs contend that as a consequence of this conflict, the

Plan has the burden of proving that the decision was reasonable and supported by substantial

evidence, and the court must take a "hard look" at the Plan's reasoning.  *Fought v. UNUM Life

Ins. Co.*, 379 F.3d 997, 1006 (10th Cir. 2004).

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the court recognized that

"if a benefit plan gives discretion to an administrator or fiduciary who is operating under a

conflict of interest, that conflict must be weighed as a factor in determining whether there is an

abuse of discretion."  *Id.* at 115.  Court have held, however, that the fact that a plan is self-

funded and administered by employees is only a standard conflict of interest that is insufficient as a matter of law to change the standard of review. *Kimber v. Thiokol Corp.*, 196 F.3d 1092 (10th Cir. 1999) (fact that an administrator is also an employee of the company's self funded plan is insufficient to change standard of review); *McDaniel v. Chevron Corp.,* 203 F.3d 1099, 1108 (9th Cir. 2000) (the standard conflict of interest that always exists when the plan administrator is responsible for both funding and paying claims "does not affect the ultimate standard of review"); *Shields v. Continental Cas. Co*, 209 F. Supp. 2d 1167, 1175 (D. Kan. 2004) (holding that the mere fact that a plan is both administered and funded by the same company does not demonstrate a per se conflict of interest).

In *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997 (10th Cir. 2004), the Tenth Circuit explained that "[t]he mere fact that the plan administrator was a [company] employee is not enough per se to demonstrate a conflict.  Rather, a court should consider various factors including whether: (1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance review or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan."  *Id.* at 1005 (citation omitted).

In this case, there is no evidence that there was an incentive to deny claims.  The Plan is self-funded and Phillips appointed the Plan fiduciaries.  But the fiduciaries' served without compensation for such service.  None of their compensation was dependent on their participation on the Plan Committee.  The fiduciaries' performance reviews or levels of compensation were not linked to the denial of benefits.  In *Heffner v. Delta Air Lines*, 2004 WL 1688515, *3 (D.

7

Utah July 26, 2004), the court recognized that "although Delta Airlines, which funds the Plan, appoints the members of the Administrative Committee, those members serve without compensation. There is no evidence before the court of any incentive for any member of the Administrative Committee to deny benefits."

Plaintiff contend that the committee member's owned stock in the company and would have an incentive to cut costs in order to keep the stock price strong. Although the fiduciaries were officers and owned stock in the company, that fact, alone, is insufficient to establish an incentive to deny benefits. The Seventh Circuit has addressed a nearly identical argument. In *Chojnacki v. Georgia Pacific Corp.*, 108 F.3d 810, 814 (7th Cir. 1997), the court held:

> The plaintiffs argue that it is virtually impossible to imagine an individual with a larger conflict of interest than Reynolds. As evidence of the alleged conflict, they point out: the EPP is unfunded, so any payments come directly from Georgia-Pacific's pocketbook; Reynolds was paid by Georgia-Pacific; he owned 12,000 shares of Georgia-Pacific stock—worth over $650,000—while serving as plan administrator and later acquired 20,000 more; he served as an officer of other Georgia-Pacific subsidiaries; and he reported directly to Georgia-Pacific's CEO.
>
> We have rejected similar claims of conflict of interest. In *Chalmers v. Quaker Oats Co.*, for example, an unfunded ERISA plan was administered by a committee made up of the corporation's officers. 61 F.3d 1340, 1344 (7th Cir. 1995). We found no conflict of interest, noting that ERISA endorses the idea that a corporate officer can also serve as a plan administrator. We explained that in such cases the impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrator's partiality. In support, we pointed out that Quaker Oats' annual revenue was over $6 billion, so the company was unlikely to flinch at paying out $240,000. Finally, we noted that companies who develop reputations for being tight-fisted when it comes to paying benefit claims might have trouble attracting new talent and be forced to pay higher wages.

8

In *Wolberg v. AT&T Broadband Pension Plan*, 2005 WL 23683, *4 (10th Cir. Jan. 6, 2005), the Tenth Circuit recognized that "where there may be what could be termed a standard conflict of interest because the plan administrator and members of the Committee are employees and participant/beneficiaries of their employer's self-funded plan," "the burden of proof is on the plaintiff to prove the existence of the conflict and to prove that any such conflict jeopardized the administrator's impartiality."

In this case, most of the members of the committee were high ranking officers of Phillips, including the Company's Chief Financial Officer, the Controller, the Vice President of Tax, and the Senior Vice President of Human Resources. Plaintiffs assert that all of these members would be aware of the Company's financial status and concerned with cost cutting. However, there is no evidence that the amount at issue would have been considered significant by any of these members.

Plaintiffs, however, have no credible evidence to show that the provision of benefits would have had a significant economic impact on Phillips. Phillips did not derive its profit solely from the administration of its ERISA plans. It had and has other means of generating profit and income. In fact, the aggregate amount of benefits that would be paid if all the Plaintiffs' claims were granted is approximately $6,701,626.32, which would amount to a mere .094% of ConnocoPhillips' production and operating expenses for 2003. Although there is no per se rule of significant economic impact, the Tenth Circuit has noted that "cost[] amount[ing] to a mere .3% of . . . operating expenses" during a particular year is not significant." *Kimber*, 196 F.3d at 1098. Moreover, the cost of the WFSP benefits at issue would amount to a mere 3.12% of the total amount of benefits paid since 2002.

9

Plaintiffs claim that during this time, the Company had a goal of reducing costs.  The Company reported financial losses around the time of the merger and was under heavy market pressure to improve the bottom line.  Public statements were also made regarding a commitment to cost reduction.[2]  Every publicly traded company, however, is cost conscious and states a commitment to such measures.  The evidence Plaintiffs submit is not persuasive and the court concludes that such arguments are merely speculative.  In light of the credible evidence before the court, there is no evidence that the Plan had a financial incentive to deny Plaintiffs' claims.

Likewise, Plaintiffs' argument that "a decision to grant benefits in this case would have a negative impact on the Company's ability to divest itself of other refinery operations" is also mere speculation.  There is no evidence that the Company had any plans of divesting itself of other refinery operations or that the Plan fiduciaries were aware of any such facts.  Such speculation fails to provide an adequate basis for finding a conflict of interest.

Plaintiffs also claim that there were serious procedural irregularities in the administrative consideration of the claim.  First, Plaintiffs contend that the decision was not a product of neutral decision-making based on the arguments made by the opposing parties but a pre-ordained business decision communicated as such to the claimants.  When Jay Hawley sent a denial to Steve Kober he stated that it was the Company's final decision on the matter.  Another senior officer of the Company, Jim Nokes, stated that "no more money would be spent on Woods Cross," or "words to that effect."  There were also internal emails recognizing that there was

---

[2]  A statement in a magazine article is clearly an out-of-court statement used to prove the truth of the facts asserted in it.  *See Hickok v. G.D. Searle & Co.*, 496 F.2d 444, 446 (10th Cir. 1974) ("It is well established that medical textbooks, treatises, and professional articles are not freely admissible in evidence to prove the substantive or testimonial facts stated therein, since they are subject to the hearsay rule.").  The court finds no indicia of reliability in the statement and no basis for relying on such hearsay.

some ambiguity in the language.

Plaintiffs' assertion that the Plan's decision was a preordained business decision, however, is not supported by the evidence. The statement that "no more money would be spent on Woods Cross" is unreliable hearsay. David Brown stated that Mark Commons stated that Jim Nokes made the statement or used "words to that effect." The fact that Brown had to state "or words to that effect" demonstrates that he does not remember the exact words that were said to him. In addition, Jay Hawley's letter sating that the Company did not believe that the union employees were entitled to benefits under the Plan was the Company's final decision on the matter expresses merely the Company's position, not the Plan's position. The is no basis for finding that Hawley was attempting to speak on behalf of the Plan. Moreover, the letter was never submitted to the Plan Administrator or to the Plan Committee and is not part of the administrative record. The fact that there was a recognition that there may be an ambiguity in the Plan also does not support a finding that there was a pre-ordained business decision or any kind of procedural irregularity.

Second, Plaintiffs claim there was a procedural irregularity because the Plan Administrator and the Plan Committee allegedly failed to make any analysis in stating their decision to deny benefits. The Plan Administrator merely stated that although there was reference in the CBA to the Layoff Plan, another plan of Phillips, there as no reference to the Plan as required by the Plan definition for employee and participant. The Plan Administrator did not analyze Plaintiffs' key argument regarding whether the Plan was a benefit provided to employees generally and that the list of benefits was not intended to be exhaustive. The Plan Committee's decision upholding the decision also failed to analyze these issues. Plaintiffs

contend that this constitutes a complete lack of analysis and is properly considered a serious procedural irregularity that forfeits deferential review.

Plaintiffs misrepresent the record when they state that the Plan Administrator and the Plan Committee failed to "make any analysis at all in stating their decision to deny benefits." The court has found no requirement under ERISA or from other courts requiring a plan to articulate each and every factor underlying an adverse benefits decision.  ERISA merely requires a plan to provide notice of a denial of benefits, "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1).  The Plan Administrator and the Plan Committee included all of the required information in their denial letters – the reasons for the adverse determination, reference to the specific Plan provisions on which the determination was based, and a description of the Plan's review procedures and the time limits applicable to such procedures.  There is no requirement to fully analyze every argument made and denied.

Several federal courts have held that adverse determinations less detailed than the determinations here satisfied ERISA's requirements.  In *Gallo v. Amoco Corp.*, 102 F.3d 918, 922-23 (7th Cir. 1996), the court held:

> The district judge went astray by requiring the plan administrator to articulate the grounds for the interpretation in the course of reviewing an adverse determination on a claim for benefits, as if the plan administrator were an administrative agency.  There is no such requirement in the law.  The administrator must give the "specific reasons" for the denial, but that is not the same thing as the reasoning behind the reasons. . . . When challenged in court, the plan administrator can defend his interpretation with any arguments that bear upon its rationality. . . . All he has to give the applicant is the reason for the denial of benefits; he does not have to explain to him why it is a good reason.  To require that would turn the plan administrators not just

12

> into arbitrators, for arbitrators are not usually required to justify
> their decisions, but into judges, who are.

The main purpose for requiring reasons to be set forth is to give the claimants enough to challenge the decision on appeal.  The decision here gave an adequate basis for Plaintiffs to mount their challenge.  This court refuses to find that anything more was required.[3]

Third, Plaintiffs assert that Defendant failed to provide full discovery responses with respect to the nature of the conflict of issue.  Plaintiffs do not state specifically what Defendant failed to provide.  However, Defendants can refuse to produce certain information that is private and unnecessary.  Defendants respond that the only information the Plan did not provide in this case is certain compensation details, such as the amount of compensation and the amount of stock holdings for fiduciaries whose compensation is not publicly disclosed.  The Plan did provide for these fiduciaries, however, whether they were entitled to a bonus, what percentage of the individual's total compensation the bonus comprised, and the details of the Company's bonus plan.  The Plan also states that it agreed to make several of the fiduciaries available for depositions, but Plaintiffs' counsel decided, in the end, not to depose these witnesses.

This is not a case where the defendants refused to produce any information.  The information produced by the Plan and the agreement to make these witnesses available for deposition was adequate.  Plaintiffs decision not to depose these witnesses was its own tactical decision.  Plaintiffs also could have brought a motion to compel before these motions were filed but they chose not to.  There is no basis for the court does to find that Defendants' actions with regard to discovery constitutes a procedural irregularity.

---

[3]  At the risk of having the same arguments leveled against this court, to the extent that Plaintiffs have made arguments that are inconsistent with this court's decision and that have not been addressed in the court's analysis, they have been considered and are denied.

Fourth, Plaintiffs claim that it was a serious procedural irregularity for the Plan Committee to refuse the Spokane Claimants appeal on the sole ground of timeliness. Plaintiffs, however, ignore the fact that the appeal was, in fact, untimely. There is evidence that both parties were potentially at fault with respect to the timeliness of the appeal. Regardless of who was at fault, the court does not believe that the facts regarding the appeal constitute a serious procedural irregularity.

Finally, Plaintiff claims there was a serious procedural irregularity because the Plan Committee was told in the appeal packet that the union had not negotiated the Plan into its CBA, but this was not disclosed to Plaintiffs despite the fact that the denial letter itself itemized the materials considered by the Committee in making its decision. There was an email attached to the Plan Committee's appeal packet stating that represented employees should not be included in Plan mailings because the Plan excludes all unions. The phrase in that email – "WFSP [the Plan] excludes all unions"– however, merely recognizes that the Plan expressly bars represented employees from participating unless the benefits are included in their applicable CBA. Even if the statement was construed to support the company's position, it was one of several items included in the appeal packet and Plaintiffs had ample opportunities to respond to and comment on this issue. Whether the Plan was a part of the CBA was the raised numerous time before the Plan Administrator and the Plan Committee. In addition, the court does not find anything troubling or deceptive in the fact that it was not listed as one of the items reviewed by the Committee.

The court concludes that Plaintiffs have not demonstrated a serious conflict of interest or a serious procedural irregularity. Accordingly, the court concludes that the arbitrary and

14

capricious standard of review should apply, adjusted only slightly for the standard conflict that is present and according significant deference to the Committee. The burden of proof as to the reasonableness of the Committee's decision remains with Plaintiffs.

This standard is significantly deferential and requires a reviewing court to find definitively that a mistake has been committed. The standard requires a trial court "to uphold the administrator's decision if it is grounded on any reasonable basis, and that basis need not be the only logical one nor even the best one." *Wolberg*, 2005 WL 23683 at *4.

## II.  Benefits Determination

To determine the reasonableness of a fiduciary's interpretation of a plan, the court must first begin with the language of the Plan itself. The Plan states that "[a] member of a recognized or certified collective bargaining unit shall not be eligible to participate in the Plan, without regard to whether such collective bargaining agreement specifically provides for the exclusion of members of such units from participation in the Plan, unless coverage under the Plan is included under the collective bargaining agreement." Because Plaintiffs in this case are members of a recognized collective bargaining unit, Plaintiffs are not eligible for Plan benefits "unless coverage under the Plan is included under the collective bargaining unit."

Defendant argues that the language of the Plan makes clear that coverage under the Plan cannot be included in the CBA by implication. The phrase "without regard to whether such collective bargaining agreement specifically provides for the exclusion of members of such units from participation in the Plan" means that Plaintiffs are not entitled to Plan benefits just because their CBA does not expressly exclude such benefits; rather, the benefits must be specifically included in the CBA.

It is undisputed that the CBAs at issue in this case do not expressly include or mention the Plan.  The Woods Cross CBA states: "Except as hereinafter limited, all benefits arranged by the Company for its employees generally shall be available to employees covered by the Agreement.  'Security Plans' and 'Benefits' include among others: . . . . m.  Layoff Plan."  The Spokane CBA contains similar language:  "Except as hereinafter limited, all benefits arranged by the Company for its employees as a whole shall be available to employees covered by the Agreement.  The term 'benefits' include such as the following: . . . . 11 Severance Pay."

Plaintiffs argue, however, that the language of the CBAs unmistakably includes the Plan.  First, Plaintiff assert that the CBA states that "all benefits arranged by the Company for its employees generally shall be available to employees covered by the Agreement [the Woods Cross CBA]."  Plaintiffs contend that the Plan is available to employees generally with only a few enumerated exceptions.  Second, Plaintiffs contend that the CBA states that the list of benefits is not exclusive.  It states "'Security Plans' and 'Benefits' include among others . . ."  Plaintiff claim that those "other" benefits would include "all benefits arranged by the Company for its employees generally."

Defendant contends that by its very terms the Plan is not generally available.  Procedurally, Plaintiffs attempt to preclude Defendant from arguing that the Plan benefits were not available to employees generally because it was not given as the basis for the denial in the Plan's decisions.  The basis for denial was that the Plan was not included in the applicable CBA.  Plaintiffs argue that the court cannot consider any other basis for the denial of benefits than those offered in the decisions because the court is limited to the arguments and evidence that were before the administrator at the time it made that decision.  The administrative record is not

limited to the written decisions of the Plan.  The administrative record includes all arguments and evidence "before" the Plan fiduciaries during the administrative process.

Here, there is no doubt that this issue was "before" the Plan fiduciaries from the inception of the administrative process.  All of these arguments and issues were advanced by Plaintiffs before the Plan Administrator.  In its letter denying the Woods Cross Plaintiffs' appeal, the Plan Committee specifically stated that it "reviewed the facts and information provided by [the Woods Cross Plaintiffs in their] . . . October 29, 2003 [letter]."  Plaintiffs' letter had raised the issue of whether the Plan benefits were generally available.

Even though each of Plaintiffs' arguments were not addressed by the Plan Administrator's decision, it does not follow that the arguments were not advanced or before the Plan.  This is not a case where a new exclusion is advanced that was never advanced or considered by the Pan.  The issues were fully presented.  The court has already found that it was not a procedural irregularity for the Plan not to address each of the arguments advanced by Plaintiffs in the analysis supporting its decision.  Based on the reasons given in the decisions, however, it is clear that the Plan considered the arguments and rejected them.  The court concludes this issue can properly be argued and analyzed before this court.

As to the merits of the argument regarding whether the Plan was a benefit that was made available to employees generally, the Plan provides that it is available only to "Employees" who are eligible to "Participate" in the Plan.  The Plan expressly excludes from coverage: (1) all employees of retail marketing stores owned directly or indirectly by Phillips or a subsidiary or affiliate of Phillips; (2) all Phillips Line Company employees on jobs categorized in the "Pipe Line Relief Labor Pool"; (3) all represented employees (unless coverage under the Plan is

17

included under the applicable CBA); (4) all "Tosco Transition Employees" identified on an exhibit to the Plan; and (5) all employees on any approved "Leave of Absence."

Also, in order for each individual employee who would not fall into these categories to be eligible for coverage under the Plan, he or she must have been on the Company's payroll on the Coverage Date, or hired during a specifically defined "Window Period." There are also limitations with respect to the definition of "Laid Off."

Plaintiffs contend that the benefit can still be for employees "generally" even if there are some exclusions or limitations on the benefits. They argue that none of the benefit plans have universal eligibility—they all have exclusions. Plaintiffs claim that they participate in other plans that have similar exclusions, and the Plan must articulate a rule that explains why the Plan benefits are not arranged for employees generally while other benefits appear to be.

Defendant argues that Plaintiffs are wrong in their assertion that no line can be drawn between unstated benefits for which Plaintiffs are eligible and benefits under the Plan. Defendants contend that there is one factor that distinguishes Plan benefits from all other benefits allegedly received by Plaintiffs:  the Plan only provides benefits to eligible participants following the occurrence of certain change-in-control events.

In reviewing the other benefit plans submitted by Plaintiffs, there is not a Plan that includes that same exclusions as the Plan in this case. Given the fact that the Plan is a change-in-control benefit that would not apply generally and it contains numerous exclusions, the court cannot conclude that the Plan improperly or unreasonably denied Plaintiffs benefits under the Plan. The court finds the Plan Administrator's decision rejecting the Spokane Plaintiffs' claim a reasoned interpretation of the Plan language which would apply equally to both Plans given the

18

insignificant differences in the language between the two plans.

> Severance Pay' is a generic term often used to describe payments made by an employer to an employee on termination of his employment.  At the time this collective bargaining agreement was first effective and later extended, Tosco was not owned by Phillips Petroleum Company and therefore, it could not have referred specifically to the Plan.  Even if it is assumed that the Plan is a 'severance pay' benefit, it is clearly not severance pay that is arranged for employees 'as a whole' since several segments of the employee population are excluded.  Additionally, the Plan only provides benefits to eligible participants following the occurrence of certain change-in-control events.  Thus, while the Phillips Layoff Plan is a Plan that is an ongoing plan providing on-going layoff benefits, and therefore, arguably could be characterized as a generic 'severance pay' plan, the Plan only provides benefits for a specified period following specified events.  Because of their special purpose, such change-in-control plans do not fall within the more generic category of 'severance pay' benefits.

Regardless of the applicable burden, the court finds the Plan's decision reasonable.  In fact, the court concludes that the Plan's decisions may have been the most correct interpretation of the given language.  The Plan provides that the represented employees shall not be eligible to participate in the Plan unless coverage under the Plan is included in the applicable CBAs.  The CBAs do not mention the Plan.  Plaintiffs attempt to claim that benefits under the Plan are generally available to company employees, but this argument ignores the exceptions included in the plain language of the Plan.  Plaintiffs also argue that the list of benefits included in the CBA is not exhaustive, but the other plans relied on by Plaintiffs are not of a similar nature.  The Plan fiduciaries' determination that "the Plan requires that coverage under the Plan must be included under the [CBAs] and the [CBAs] applicable to the Plaintiffs do[] not include the Plan" was a reasonable determination.  Therefore, the court concludes that the decisions should be upheld because there is clearly substantial evidence to support the Plan's decision under any standard of

review.

### Defendant's Motion to Strike

Defendant moves to strike the Declaration of David Brown, a magazine article, and a Yahoo! finance report on ConocoPhillips purporting to show the details of certain stock transactions by Plan fiduciaries.  Defendant contends that these materials are inadmissible hearsay that are inadmissible to support summary judgment.  The court agrees.

*1.  Brown Declaration*

The Brown declaration contains the double hearsay statement of Jim Nokes that "there would be no more money spent on Woods Cross or words to that effect."  This testimony is so unreliable that it is stricken.

*2.  Magazine Article*

A magazine article in Alexander's Gas & Oil Connections is clearly offered to prove the truth of the matters asserted in the article–that ConocoPhillips planned to sell assets and raise its cost-cutting goal.  *See Hickok v. G.D. Searle & Co.*, 496 F.2d 444, 446 (10th Cir. 1974) ("It is well established that medical textbooks, treatises, and professional articles are not freely admissible in evidence to prove the substantive or testimonial facts stated therein, since they are subject to the hearsay rule.").  This is hearsay and is stricken.

*3.  Yahoo! Report*

The hearsay requirements that relate to the magazine article apply equally to the Yahoo! report.  The Plan has never disputed that its fiduciaries own stock.  Nevertheless, the report is stricken.

The court notes, however, that even if it were to leave these materials in the record, none

20

of them would influence or change the court's decision with respect to the conflict of interest issue.  Nonetheless, the materials are appropriately stricken.

## CONCLUSION

Based on the above reasoning, Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Summary Judgment is DENIED.  Defendant's Motion to Strike is also GRANTED.

DATED this 10th day of March, 2006.

BY THE COURT


DALE A. KIMBALL
United States District Judge